**Robert G. SWOFFORD, Jr., and individual and his wife, Sharon R. Swofford, an individual, Plaintiffs,**

v.

**Donald ESLINGER, in his official capacity as the Sheriff of Seminole County, Florida; William Morris Jr., in his individual capacity, and Donald Remus, in his individual capacity, Defendants.**

Case No.: 6:08–cv–00066–Orl–35DAB.

United States District Court,
M.D. Florida,
Orlando Division.

Sept. 28, 2009.

Albert F. Tellechea, David A. Jones, Luis Javier Gonzalez, Suzanne E. Gilbert,

Amy Robin Rigdon, Kenneth J. Idle, Min Ki Cho, Victoria Heather Mitchell, Holland & Knight, LLP, Orlando, FL, for Plaintiffs.

D. Andrew Debevoise, Erin McCaughey Tueche, Thomas W. Poulton, Jeffrey K. Grant, Debevoise & Poulton, PA, Winter Park, FL, for Defendants.

## ORDER

MARY S. SCRIVEN, District Judge.

**THIS CAUSE** comes before the Court for consideration of Plaintiffs' Motion for Spoliation Sanctions (Doc. No. 44)(the "Motion").[1] Plaintiffs' Motion seeks sanctions against all Defendants for bad faith spoliation of various pieces of evidence. During the Court's evidentiary hearing on the Motion on June 11, 2009, the Court granted Plaintiffs' Motion, leaving only the determination of appropriate sanctions to be imposed remaining for the Court's consideration. The imposition of sanctions against Defendants pursuant to the Motion is discussed herein.

## I. BACKGROUND

### A. Case Summary

This case arises from the shooting of Plaintiff Robert Swofford ("Swofford") on April 20, 2006, by Defendants William Morris, Jr. ("Morris") and/or Ronald Remus ("Remus"). Morris and Remus, Deputies for Seminole County Sheriff's Office ("SCSO"), were pursuing what they believed to be two car burglary suspects when they encountered an armed Mr. Swofford on Swofford's property and fired upon him. Donald Eslinger is a third defendant in this case, being sued in his official capacity as the Sheriff of Seminole County, State of Florida. Mr. Swofford brings a § 1983 claim against Defendants for the use of excessive force and unlawful entry onto the Swoffords' property, in violation of Mr. Swofford's Fourth Amendment rights. Mr. Swofford also brings state law claims of battery, gross negligence, simple negligence, and negligent training and supervision. Mrs. Swofford brings a claim for loss of consortium. (Doc. No. 2.)

Summarily, the facts giving rise to Plaintiffs' claims are as follows: While Remus was on bicycle patrol at an apartment complex near Swofford's property during the early morning hours of April 20, 2006, Remus observed and pursued two burglary suspects. After pursuing persons away from the location in question, Remus returned to the location at which he first observed the suspects to continue his investigation. When Morris arrived with his K–9 to assist, Remus and Morris searched along the fence dividing the apartment complex from Swofford's property. Remus, Morris, (the "Deputies") and the K–9 entered Swofford's property through a space Morris created in the fence. At some point during this melee, Swofford, asleep inside his house, was awoken by his dog barking and went outside, armed, to check his property. Upon hearing voices and seeing the beams of the Deputies' flashlights enter his property, Swofford followed the beams as they crossed his property. The Deputies, encountering Swofford, opened fire, shooting him seven

1. The Court held a hearing on the Motion on June 11, 2009. After the Hearing, the Court received, at its request, memoranda from the parties explaining their respective views on the appropriate sanctions to be imposed as a result of the Court's finding of spoliation by Defendants. (Doc. Nos. 235, 236.) Pursuant to leave granted by the Court, Defendants responded to Plaintiffs' Memorandum, addressing only the amount of fees demanded by Plaintiffs. (Doc. No. 240.) Each of the foregoing is considered and addressed in this Order.

times. Swofford sustained serious injuries and spent six weeks in the hospital.

### B. The Motion for Spoliation Sanctions

The Motion presently before the Court asserts that Defendants have destroyed or lost key evidence, despite the Defendants' independent duty to preserve this evidence and the Plaintiffs' specific requests that evidence be preserved. (Doc. No. 44 at 1–2.) The issues raised in the Motion pertain to the following pieces or categories of evidence: Deputy Remus' laptop computer; all SCSO emails from April 20, 2006, to June 2007; and the Deputies' radios, guns, and uniforms used on the night of April 20, 2006.[2]

### C. The Court's Finding on Spoliation

That we are here on this issue is inexplicable and inexcusable. On August 24, 2006, Plaintiffs' counsel sent a letter to the SCSO requesting that all evidence in the SCSO's possession related to the shooting be maintained in its original order. (Doc. No. 44 at 3.) Plaintiffs' counsel sent a second letter to the SCSO, dated February 6, 2007, also requesting that all evidence related to the shooting be preserved and listing specific types of evidence, including firearms, clips and ammunition, training records, and electronic evidence. (Doc. No. 44 at 3–4.) In addition to the preservation letters, on or about February 26, 2007, Plaintiffs' counsel served on the SCSO a notice letter pursuant to § 768.28,

Florida Statutes, informing the Sheriff that a claim would be filed against the Sheriff and Deputies Morris and Remus. (Doc. No. 44 at 5.) From March 2007 through August 2007, the SCSO also received public records requests from Plaintiffs' counsel for particular information, including e-mail communications related to the shooting investigation. (Doc. No. 44 at 5–6.)

The SCSO acknowledges that it received both letters from Plaintiffs' counsel and the other notices as well. (Doc. No. 50 at 3–4; Hr'g Tr. 11:9–10.). Additionally, Defendants were under an obligation to retain the evidence in question while the outcome of a law enforcement investigation was pending. Nevertheless, upon its receipt of the letters, the SCSO never issued any directives or "litigation hold memos" to suspend all orders, practices, or policies that could lead to the destruction of evidence relevant to this case. As admitted at the Hearing by David Lane, SCSO's General Counsel since March 2006, the *only* action taken by anyone at the SCSO in response to the preservation letters was that Linda McDaniel, a paralegal in the General Counsel's office, reviewed the letters and forwarded a copy of the letters to approximately six senior SCSO employees, including Sheriff Eslinger.[3] (Hr'g Tr. 171:24–172:1.) The second preservation letter, dated February 6, 2007, was also disseminated to Lieutenant Bill Morris, who is Captain of Professional Standards

---

**2.** The Motion also alleged that the SCSO had failed to preserve the training records of Morris's K–9 and the unused bullets and magazines from the night of the shooting. However, these issues have subsequently been resolved between the parties and will, therefore, not be addressed in this Order. (Hr'g Tr. 46:14–47:4; Doc. No. 50 at 9.)

**3.** Additional listed recipients were Chief Deputy Steve Harriett, Captain Martin Linnenku-

gel (Captain of Professional Standards), Captain Randy Pittman (Captain for Diversified Investigative Services), Mona Rumph (supervisor of the Telecommunications Division), and Ann Mallory (supervisor of the Forensics Department, which included the armory, at that time). (Doc. No. 50 at 4.) None of these individuals was called to testify at the Hearing.

and also the father Defendant William Morris, Jr.[4] (Doc. No. 50 at 4.) According to Lane, by merely copying the preservation letter and distributing it to the list of senior employees, he believed that the SCSO "would cover the course and scope of the evidence requested in [the] first letter and in the second letter as well;" nothing further needed to be done. (Hr'g Tr. 171:2–9.) Deputies Morris and Remus, two of the three defendants in this case, allegedly did not receive a copy of the preservation letters and never received any instructions to preserve evidence pertaining to the shooting of Mr. Swofford.

Despite that the senior employees listed by Ms. McDaniel received copies of the preservation letters, including the Sheriff himself, *not one* of those individuals did anything to see that SCSO employees complied with SCSO's legal obligations to preserve evidence relevant to Plaintiffs' case. Even in the face of the Plaintiff's Motion for Spoliation Sanctions, filed on November 21, 2008, the SCSO's Office of General Counsel still had not, as of the Hearing on June 11, 2009, done anything to ensure that SCSO employees were properly complying with the preservation letters. At the Hearing, Defendants attempted to avoid sanctions by presenting a number of subordinate employees as witnesses. Yet, none of these witnesses were on the list of persons to whom Ms. McDaniel circulated the preservation letters. Each testified predictably that, if they spoliated evidence, it was unintentional because they had not been made aware of the preservation letters or the impending lawsuit. (Hr'g Tr. 14:6–13.) However, as the Court explained in *Turner v. Hudson Transit Lines, Inc.*,

> [i]t is no defense to suggest, as the defendant[s] attempt[ ], that particular

employees were not on notice. To hold otherwise would permit an agency, corporate officer, or legal department to shield itself from discovery obligations by keeping its employees ignorant. The obligation to retain discoverable materials is an affirmative one; it requires that the agency or corporate officers having notice of discovery obligations communicate those obligations to employees in possession of discoverable materials.

142 F.R.D. 68, 73 (S.D.N.Y.1991) (citation omitted).

The SCSO's explanations, of course, merely beg the penultimate question, why weren't the ordinary procedures for destruction suspended or abated and *all* evidence preserved in light of the preservation demands duly, timely, properly and necessarily served in this case, and prompt the ultimate question, what should be the consequences for this abject failure to comply with legal standards?

## II. LEGAL STANDARD FOR SPOLIATION SANCTIONS

■ "Spoliation" is the "intentional destruction, mutilation, alteration, or concealment of evidence." *Optowave Co. v. Nikitin*, No. 6:05–cv–1083–Orl–22DAB, 2006 WL 3231422, at *7 (M.D.Fla. Nov. 7, 2006)(quoting Black's Law Dictionary 1437 (8th ed. 2004)). Sanctions for spoliation of evidence are "intended to prevent unfair prejudice to litigators and to insure the integrity of the discovery process." *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir.2005), *cert. denied*, 548 U.S. 903, 126 S.Ct. 2967, 165 L.Ed.2d 950 (2006). Federal law governs the imposition of spoliation sanctions, but the Court's opinion may be "informed" by state law, as

---

**4.** The second preservation letter was also sent to Senior Manager Eileen Long, who is in charge of human relations and deals with personnel files. *Id.*

long as it is consistent with federal law. *Id.*[5]

 "Sanctions may be imposed against a litigant who is on notice that documents and information in its possession are relevant to litigation [ ] or potential litigation … and destroys such documents and information." *Optowave*, 2006 WL 3231422 at *7. The elements of a spoliation claim are: (1) the existence of a potential civil action; (2) a legal or contractual duty to preserve evidence which is relevant to the potential civil action; (3) destruction of that evidence; (4) significant impairment in the ability to prove the lawsuit; (5) a causal relationship between the evidence destruction and the inability to prove the lawsuit; and (6) damages. *Green Leaf Nursery v. E.I. DuPont De Nemours and Co.*, 341 F.3d 1292, 1308 (11th Cir.2003). Additionally, in the Eleventh Circuit, sanctions for spoliation of evidence are appropriate "only when the absence of that evidence is predicated on bad faith…. 'Mere negligence' in losing or destroying the records is not enough for an adverse inference, as 'it does not sustain an inference of consciousness of a weak case.' " *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir.1997)(quoting *Vick v. Tex. Employment Comm'n*, 514 F.2d 734, 737 (5th Cir.1975)). However, the spoliating party need not have acted with malice when spoliating the evidence in order for the court to draw an adverse inference. *Graff v. Baja Marine Corp.*, 310 Fed. Appx. 298 (11th Cir.2009) (citing *Flury*, 427 F.3d at 946).

 The court's power to impose sanctions "derives from the court's inherent power to manage its own affairs and to achieve the orderly and expeditious disposition of cases." *Flury*, 427 F.3d at 944 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)). When fashioning a remedy for spoliation, the Court has broad discretion in its determination. *See Optowave*, 2006 WL 3231422 at *1 (citing *Chambers*, 501 U.S. 32, 111 S.Ct. 2123 (1991)). "[T]he determination of an appropriate sanction … is assessed on a case-by-case basis." *Id.* at *12 (citing *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 430 (S.D.N.Y. 2004)). Sanctions the Court may impose against a defendant for spoliation include, but are not limited to, the following: default judgment, adverse inference or rebuttable presumption instructions to the jury, striking pleadings, and an award of fees and costs incurred by the injured party as a result of the spoliation. *See Flury*, 427 F.3d at 945. "Factors to be considered when determining the seriousness of the sanctions to impose against a party for failure to preserve critical evidence in its custody vary according to (1) the willfulness or bad faith of the party responsible for the loss or destruction of the evidence; (2) the degree of prejudice sustained by the opposing party; and (3) what is required to cure the prejudice." *St. Cyr v. Flying J. Inc.*, 3:06–cv–13–33TEM, 2007 WL 1716365, at *4 (M.D.Fla. June 12, 2007).

## III. DISCUSSION

### A. Bad Faith

 Nothing other than bad faith can be inferred from the facts of this case.

---

**5.** "Although the Eleventh Circuit in *Flury* analyzed spoliation sanctions in the context of a diversity suit and looked to Georgia state law to inform its opinion, the court also concluded that … Georgia law on spoliation was consistent with federal law." Therefore, "the fact that this case is not a diversity suit has no bearing on the applicability of the law governing spoliation sanctions as determined by the court in *Flury*." *Connor v. Sun Trust Bank*, 546 F.Supp.2d 1360, 1376 n. 6 (N.D.Ga. 2008).

Plaintiffs' letters were clear and concise, and the SCSO admits, without qualification, that the letters were received by the SCSO. SCSO's in-house counsel, Lane, failed to ensure that evidence be preserved. "It is not sufficient to notify employees of a litigation hold and expect that the [employee] will then retain and produce all relevant information. Counsel must take affirmative steps to monitor compliance so that all sources of discoverable information are identified and searched [and in this case, preserved.]" *Zubulake*, 229 F.R.D. at 432. Nothing of the sort was done in this case. In fact, Lane professed not to have ever read the Federal Rules of Civil Procedure to ascertain on even a rudimentary level what his and his client's obligations were in this regard (Hr'g Tr. 172:2–15), and, not surprisingly, nothing was done in this regard. But Lane is clearly not the only individual at fault for the spoliation. The senior SCSO officials who received the letters, including the Sheriff himself, completely disregarded the letters and their resultant legal obligations. Thus, the following exchange ensued between the Court and outside Defense counsel at the hearing:

THE COURT: Well, what was done in response to the letters?

MR. POULTON: Well, we'd have to ask each individual person within each individual—

THE COURT: Well, you've already done that, and what did they tell you?

MR. POULTON: **There wasn't anything particular done to sequester evidence.**

THE COURT: So, they got the letters, File 13, and that was the end of it?

MR. POULTON: Well, yes, Your Honor. Nothing was particularly kept back.

(Hr'g Tr. 12:8–19)(emphasis added).

The evidence shows further that the officials not only failed to direct their lower level employees to preserve evidence, but in at least one instance, two of the recipients were directly responsible for the spoliation that occurred. At the Hearing, David O'Connor, who worked as an investigator in Domestic Security and also worked in the SCSO Professional Development division in 2006, testified regarding the events that led to the ultimate dismemberment of the weapons used by the officers on the night of April 20, 2006. According to O'Connor, he collected the old guns from the SCSO officers, including Morris and Remus, so that the guns could be returned to the manufacturer for disassembly and replaced by new guns. Ann Mallory, Director of the Forensics Department, was responsible for sending the weapons to the manufacturer. (Hr'g Tr. 111:15–24.) Despite having received copies of both preservation letters, Mallory sent the guns used by Morris and Remus back to the manufacturer for dismemberment. Additionally, Defendant Morris's father, Lieutenant Bill Morris, was O'Connor's supervisor at the time that O'Connor collected the guns from Defendants Morris and Remus. Yet, despite Lieutenant Morris's having received a copy of the preservation February 6, 2007 letter, Lieutenant Morris never told O'Connor that there was any need to preserve the weapon that his son used on the night that his son shot Mr. Swofford. (Hr'g Tr. 113:16–24.) O'Connor testified that, after the guns were mailed to the gun manufacturer, there was conversation among his department about contacting the manufacturer to see if the guns could be returned. However, O'Connor never contacted the manufacturer, and there is no evidence that any attempt was made by any other individual to do so. (Hr'g Tr. 116:5–17.) As noted, even as late as the date of the hearing and faced with possible sanctions for the failure to preserve evidence, the Defendants still had

undertaken no effort to preserve evidence in the case.

Thus, this is not a circumstance of inadvertent destruction of evidence or negligence in the loss of material data from which the Court is being asked to infer bad faith. Rather, it is a case of knowing and willful disregard for the clear obligation to preserve evidence that was solely within the possession and control of the Defendants and whose contents have no other source than that which has now been spoliated. Thus, the bad faith is clear, and the prejudice to the Plaintiffs is substantial.

As a direct result of Defendant SCSO's wanton and willful disregard of its obligations to preserve evidence, both as a litigant and as a law enforcement entity, SCSO has inhibited the production of evidence that may have been detrimental to its case. Whether the spoliated evidence would have actually been detrimental to the case is irrelevant at this point, because no one, other than perhaps the Defendants themselves, can know for certain. *See Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 133 (S.D.Fla.1987)("[W]hile it is now impossible to determine precisely what or how many documents were destroyed, the bad faith destruction of a relevant document, by itself, 'gives rise to a strong inference that production of the document would have been unfavorable to the party responsible for its destruction.' ") (citations omitted).

Faced with the responses of its witnesses and under questioning from the Court concerning these clear duties and abject failures to adhere to them, SCSO, through its counsel, Mr. Lane, ultimately capitulated, stating:

"[c]ertainly, we've made mistakes here. And I can't sit here and tell you we haven't. Certainly those mistakes could prejudice the plaintiffs in their prosecution of the case. And as such, I believe you ought to look at the severity of the mistakes and their bearing on the overall action and rule accordingly."

(Hr'g Tr. 178:22–179:2). The Court accepts the invitation and shall impose sanctions in this case.

**B. Sanctions Against Deputies Morris and Remus**

 The Court addresses whether the sanctions imposed under this Order are imposed against all Defendants in this case, including Morris and Remus, or only against the SCSO. Despite the SCSO's concession that it discarded material demanded by the preservation letters and by law and despite that Defendants Morris and Remus also failed to preserve evidence, Defendants argue that no sanction should be imposed against Defendants Morris or Remus in their individual capacities because they were not on notice of the need to preserve evidence, since neither of them personally received a copy of either preservation letter. This suggestion does not absolve Defendants from their preservation and non-spoliation obligations. Plaintiffs' counsel were precluded by Florida Rule of Professional Conduct 4-4.2 from contacting Morris and Remus directly, and thus, it was Defendants' counsel's obligation to ensure that Morris and Remus each received a copy of the letter and complied with it. Rule 4-4.2 prohibits *ex parte* contact by attorneys with persons represented by counsel. Further, the Comment to Rule 4-4.2 states:

In the case of an organization, this rule prohibits communications by a lawyer for 1 party concerning the matter in representation with ... any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement

may constitute an admission on the part of an organization.

*See also H.B.A. Management, Inc. v. Estate of May Schwartz*, 693 So.2d 541, 545 (Fla.1997) (discussing Rule 4–4.2; "[A]n attorney may not directly contact any person he or she knows is represented by counsel concerning the dispute, not merely those who are named parties to the litigation. . . . [C]urrent employees are covered by the rule even though they may not be formal parties in a court case."). Not only are Morris and Remus parties to this litigation, but they were also SCSO employees when the preservation letters were received by the SCSO. In light of the fact that the actions of Morris and Remus implicate the SCSO in this case, certainly Rule 4–4.2 prohibited Mr. Wood and Mr. Tellechea from sending the preservation letters directly to Morris and Remus.

Furthermore, the Court finds that Mr. Lane represented Officers Morris and Remus until they retained outside counsel. According to the SCSO General Order, defining the duties and functions of various SCSO employees, "[t]he General Counsel is responsible for the review of matters that have legal consequence for the agency." (Doc. No. 235, Exh. D at 45.) Further, Mr. Lane stated that outside counsel are typically not retained by the Florida Sheriff's Self–Insurance Fund until the SCSO is actually served with a lawsuit, and he admitted that he was the sole lawyer responsible for responding to the preservation letters. (Hr'g Tr. 170:1–171:1.) Mr. Lane also stated that, if Morris and Remus "had been contacted by somebody representing Mr. Swofford, certainly I would have been concerned. Certainly I would have attempted to bring the matter up with the Fund, would obtain coverage

immediately. . . ." (Hr'g Tr. 191:17–20.) In light of the foregoing facts, the Court finds that Lane was acting as counsel for all Defendants in this case at the time he received copies of the preservation letters.[6] Therefore, Morris and Remus received their preservation letters from Plaintiffs through their counsel, Lane. They cannot absolve themselves of liability from their failure to preserve the evidence by having their counsel withhold the demand for preservation from them. If the law were otherwise, no party would be responsible for the willful violation of a preservation demand or the destruction of evidence known to be relevant to ongoing or impending litigation if they simply counseled their attorney not to communicate the demand to them.

Not only should Defendants be charged with notice of their obligation to preserve evidence, but the evidence of Record demonstrates that Defendants Morris and Remus willfully contributed to the spoliation of relevant evidence by turning evidence in to the SCSO with knowledge that the evidence would be destroyed. (See the discussion below concerning individual pieces of evidence) Further, the Court questions the veracity of Defendants' testimony in this case. Both suggested as law enforcement officers and as potential defendants that they were not aware of the need to preserve relevant evidence. The Court finds this testimony lacks credibility. The Court also questions Remus's candor, specifically in light of Remus's testimony regarding an instant message conversation he engaged in with another officer. In the conversation, the other officer referred to Remus as the "Lotto killa." Remus replied facetiously to the officer, "I need to go to the sign shop and have them

---

**6.** Morris, Remus and the SCSO all retained the same outside counsel at some point after their receipt of the preservation letters.

put that name on the side of the car." (Hr'g Tr. 63:15–65:5.) In this regard, it was widely known that Mr. Swofford had won the Florida lottery prior to his unfortunate encounter with the Deputies. (R. Swofford Dep. 110:13–16, Jan. 6, 2009.) However, when questioned about the "Lotto killa" conversation, Remus testified that, at the time of the conversation in which he fully participated, he did not know that the term "Lotto killa" was in reference to Mr. Swofford. He further testified that his responses to the other officer during that conversation were just "to get him to stop talking to me." (Hr'g Tr. 65:6–15.) The Court does not take lightly the tenor of this testimony. Remus's less than candid response that he did not know what the conversation was about and his demeanor during the hearing on this issue call into question the veracity of his testimony in its entirety. Accordingly, the Court finds that there is sufficient evidence of knowledge of the obligation to preserve evidence and bad faith refusal to do so by Defendants Morris and Remus; thus, the imposition of sanctions against Morris and Remus for spoliation of evidence is warranted.

### C. Imposition of Sanctions Regarding Particular Evidence

#### 1. Deputy Remus's Laptop Computer

■ Defendants admit that MCT Unit No. SD14544, the laptop computer issued to Mr. Remus by the SCSO, was taken from SCSO on October 18, 2007, and fully erased by Creative Recycling Records.[7] Not only was the laptop in use by Remus on the night of the shooting, but the laptop was also used by Remus for the electronic instant message "Lotto killa" conversation. Defendants SCSO and Remus claim that

"the agency discovered it had a backlog of older and broken computers[,] and research was done as to how to safely and inexpensively discard them." However, Defendants offer no cogent, benign explanation for the failure to except Remus's computer from that routine purging of old computers in light of the preservation demand. Instead, Remus returned his laptop to the SCSO to be sent away and erased more than one year after Defendants had received their first preservation letter from Plaintiffs.

Based on both the SCSO's and Remus's direct disregard of the preservation letters and Remus's less than candid testimony concerning activity on his laptop computer, the Court finds that the imposition of the adverse inference regarding the laptop computer is appropriate. The jury, therefore, will be instructed that it may infer that Remus's laptop computer contained information detrimental to the SCSO's and Remus's defense of this case. The jury will further be instructed that it should not draw an adverse inference against Morris regarding the destruction of Remus's laptop.

#### 2. SCSO Emails

■ Defendants have also spoliated emails sent to and from SCSO officers' email accounts from April 20, 2006 to April 2007. Prior to April 2007, the SCSO had no system for archiving emails and no policy that prevented officers from deleting emails on their computers. (Hr'g Tr. 123:13–15; 130:13–22.) Officers were not able to delete instant messages from their computers. (Hr'g Tr. 129:6–10.) Further, the SCSO provided no instruction to the IT Department regarding a litigation hold on electronic information concerning the

---

7. The exact date when Remus returned his laptop to the SCSO in exchange for a new one is unknown. (Doc. No. 50 at 15.)

Swofford lawsuit. (Hr'g Tr. 130:8–12.) Therefore, prior to April 2007, an officer could delete an email at will, and if that email was deleted, it was lost forever. *Id.* at 130:13–22. In April 2007, the SCSO migrated to a vault system, where the SCSO stores and keeps every email sent to and from SCSO email accounts. (Hr'g Tr. 125:24–126:1.) Steven McConnell, SCSO's Information Services ("I.S.") Operations Manager, admitted that the I.S. Department could have disabled the delete function on officers' computers had it been directed to do so. (Hr'g Tr. 131:5–10.) In fact, despite Defendants' having received two preservation letters that specifically requested that Defendants preserve electronic information, both Morris and Remus admit that they permanently deleted emails from their agency accounts. (Hr'g Tr. 40:19–41:13; 59:15–25; 66:22–67:6.)

In light of both Defendants' blatant disregard of their obligation to preserve electronic information and Remus's "Lotto killa" conversation over instant message, the Court can surmise that emails deleted by Morris and Remus, and perhaps other SCSO officers, contained content detrimental to Defendants' case. Accordingly, the Court finds that an adverse inference should be imposed against all Defendants for the destruction of emails from April 20, 2006 to April 2007. The jury shall be instructed that it may infer that emails deleted from April 20, 2006, to April 30, 2007, contained information detrimental to all Defendants in this case.

### 3. The Deputies' Radios

 Plaintiffs requested the production of the radios used by Morris and Remus on the night of April 20, 2006, to establish that the radios were vox-enabled (voice activated). Plaintiffs contend that the issue of whether the radios are vox-enabled is relevant because the "SCSO has a radio-dispatch recording from the ap-

proximate time of the shooting[,] in which there is no recorded evidence of Remus or Morris identifying themselves to Mr. Swofford." (Doc. No. 235, Exh. B.) At the Hearing, Remus testified that, immediately before, after and during the shooting, he was unable to communicate with dispatch because his radio would not transmit. (Hr'g Tr. 69:3–21.) Robert Colbert, SCSO Communications Coordinator in 2006, admitted that either a vox-enabled radio or a stuck microphone, perhaps that of Morris, could have caused the busy signal that Remus claimed to have encountered during Mr. Swofford's shooting. (Hr'g Tr. 75:10–16.) Defendants have provided testimony and affidavits stating that the SCSO does not and has never used vox-activated radios. (*Id.* at 75:14–19; Doc. No. 50 at 12.)

Until the Hearing, neither radio had been produced. At the hearing, Defendants produced the radio used by Morris on the night of April 20, 2006, but they did not produce any of the accessories that accompany the radio, specifically, the actual shoulder microphone and earpiece used by Morris on that night. Defendants did produce exemplar accessories used during the period of April 2006, specifically two types of shoulder microphones. Defendants cannot produce Remus's radio because the radio was reassigned before Remus left the SCSO and can no longer be identified. (Hr'g Tr. 99:7–21.)

Defendants contend that sanctions for the spoliation the radios are unwarranted because the letter does not explicitly ask for the radios. However, the Court finds that Mr. Tellechea's February 2, 2006, letter to Defendants, requesting the preservation of "radio transmissions," was sufficient notice to Defendants that the radios are evidence that is relevant to this case. Accordingly, the Court imposes a presumption in favor of Plaintiffs that the

radios and their missing accessories would yield evidence adverse to Defendants' case had they been produced. Plaintiffs may submit to the jury good faith arguments as to what adverse conclusion the jury might draw. Defendants may rebut Plaintiffs' contentions with appropriate, relevant evidence.

### 4. The Deputies' Guns

Despite having received two preservation letters, including a letter from Mr. Tellechea, which specifically requests the preservation of firearms, Defendants disposed of both Morris's and Remus's guns used on April 20, 2006. Defendants Morris and Remus each returned their guns to the SCSO armory in 2007; Morris's firearm was exchanged on or about March 31, 2007, and Remus', on or about April 25, 2007. (Doc. No. 50 at 7). Ann Mallory, the SCSO Armorer, received a copy of both preservation letters from Ms. McDaniel. Nevertheless, as part of an agency-wide firearm exchange, Ms. Mallory oversaw the collection of all of the firearms, including those issued to Morris and Remus, and then she returned them to Sig Sauer, the firearm manufacturer. (Hr'g Tr. 112:22–113:15.) Although there were conversations concerning the possible retrieval of the weapons used by Remus and Morris, no efforts were actually made to retrieve the weapons. Once the guns were returned to Sig Sauer, they were completely disassembled. *Id.* at 119:5–15.

Plaintiffs assert that they are prejudiced by Defendants' spoliation of the guns used by Morris and Remus on April 20, 2006, because "Deputy Morris' gun had a trigger pull weight that was significantly less than that allowed by the Sheriff's Office, a fact described in the report by FDLE." (Doc. No. 44 at 17; Hr'g Tr. 233:2–10.) According to Plaintiffs, "[r]educed trigger pull would make the gun easier to fire, thus contributing to Mr. Swofford's injuries."

(Doc. No. 44 at 17) According to Plaintiffs' expert witness, Richard Ernest, the gun may be have been tampered with by Morris or another party, or the "reduced trigger weight [may have been] caused by wear and tear of the gun." *Id.* Defendants argue that the trigger pull weight of the guns is not material evidence because the shooting of Mr. Swofford was intentional. That is, any trigger pull weight is offset because both officers intended to fire upon the Plaintiff.

Based on the Record presently before the Court, it is unclear whether the guns, particularly the gun used by Officer Morris on the night of April 20, 2006, are relevant, material evidence to the material facts in dispute in this case. Therefore, the Court will not impose an adverse inference for the spoliation of the guns at this time. However, Plaintiffs may renew their Motion with respect to either or both guns with the proper showing of relevance to expert testimony and the resulting prejudice to Plaintiffs' case.

### 5. The Deputies' Uniforms

 Defendants are unable to provide the actual uniforms worn by Morris and Remus on the night of April 20, 2006. Remus' uniform was destroyed when he left the SCSO as a routine procedure, and Morris has allegedly had uniforms going in and out of circulation over the years, though at the Hearing, Morris did not provide any explanation for why the particular uniform on April 20, 2006, is missing. (Doc. No. 50 at 9–10; Hr'g Tr. 42:8–43:6.) An important factual issue in this case is whether Mr. Swofford recognized Morris and Remus as police officers during the early morning hours of April 20, 2006. In this regard, the uniforms are certainly relevant pieces of evidence. Plaintiffs contend that Swofford could not recognize Remus or Morris as deputies because neither was wearing a typical deputy uniform,

and any identifying insignia that was on the uniforms is unknown. (Doc. No. 44 at 13–14.) The SCSO responds that the evidence preservation letters from Plaintiffs did not request that uniforms be preserved and that the uniforms were not destroyed in bad faith.

Neither preservation letter and no other notice to Defendants suggested that the uniforms should be preserved. Further, there is no evidence of record to suggest that the SCSO and the officers were on notice that the uniforms may be relevant to the Swoffords' case prior to the date the uniforms were destroyed or lost by Defendants. Because the Court cannot find that Defendants were on notice that the uniforms worn by the Officers on the night of April 20, 2006, needed to be preserved, instructions to the jury concerning Defendants' destruction of the uniforms are not warranted.

### D. Attorney's Fees

 As alluded to in the Court's Order of July 8, 2009, some amount for the fees and costs associated with the Motion will be awarded to Plaintiffs. (Doc. No. 240.) Because this sanction is imposed pursuant to the Court's inherent authority, *Flury*, 427 F.3d at 944, the amount of fees and costs awarded may not exceed the "costs, expenses, and attorneys' fees reasonably incurred because of [the sanctionable] conduct." *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1239 (11th Cir.2007)(applying the standard for fees set forth in 28 U.S.C.A. § 1927 to cases in which the court awards fees and costs as a sanction pursuant to its inherent authority). Plaintiffs' memorandum explaining their views on the appropriate sanctions to be imposed for Defendants' spoliation of evidence (hereinafter, "Plaintiff's Supplemental Memorandum") states that, at the time the memorandum was filed, Plaintiffs

had accumulated expenses of $298,742.15 in attorneys' fees and $6,542.56 in costs associated with the spoliation and sanctions issues in this case. (Doc. Nos. 235.) Pursuant to Defendants' Motion to Respond (Doc. No. 240), Defendants were granted leave to respond to the amount of fees demanded. The Court has reviewed all relevant filings pertaining to fees and costs and will dispose of the tangential issues related to fees and costs in this Order. However, the Court will leave for later determination the precise amount of fees to be awarded.

 The parties raise the issue concerning upon whom the sanction awarding fees and costs to Plaintiffs should be imposed. Per the Court's prior discussion regarding the imposition of sanctions against Morris and Remus, the award of costs and fees will be imposed against all Defendants in this case. *See infra* pp. 11–13. Additionally, 28 U.S.C. § 1927 permits the Court to sanction "[a]ny attorney or other person admitted to conduct cases in any court of the United States ... who so multiplies the proceedings in any case unreasonably or vexatiously." As when the court sanctions parties pursuant to its inherent authority, a showing of "bad faith" is required to impose sanctions under § 1927. *Schwartz v. Millon Air, Inc.*, 341 F.3d 1220, 1225 (11th Cir.2003). "While an attorney's conduct must be tantamount to bad faith, 'for the purposes of § 1927, bad faith turns not on the attorney's subjective intent, but on the attorney's objective conduct.' " *Hudson v. International Computer Negotiations, Inc.*, 499 F.3d 1252, 1262 (11th Cir.2007) (citation omitted). The Court finds appropriate the imposition of fees and costs against Mr. Lane in light of his complete failure to fulfill his duty, both in his official capacity as General Counsel for the SCSO and as initial counsel for all Defendants in this case, to take affirmative

steps to monitor compliance so that all relevant, discoverable information is identified, retained and produced.[8] *In re: Seroquel Products Liability Litigation,* 244 F.R.D. 650, 663 (M.D.Fla.2007)(citing *Zubulake,* 229 F.R.D. at 432). Therefore, the award of fees and costs[9] will be imposed jointly and severally against each of the three Defendants and Mr. Lane, each in his official capacity.[10]

Plaintiff's Supplemental Memorandum requests the Court to "impose the burden of pay fees and costs on the Defendants themselves and [to] forbid them from passing that expense through their insurer." (Doc. No. 235 at 12.) Plaintiffs provide no legal or factual support for such request. Upon consideration, the Court finds that issues concerning Defendants' insurance coverage for matters arising out of this litigation are outside the purview of this Court. Accordingly, the Court will not address the issue of whether the insurance carrier may or should bear any portion of the burden of the expenses resulting from the imposition of a fees and costs sanction.

With regard to the specific amount of fees to which Plaintiffs assert they are entitled, Defendants raise a number of issues concerning Plaintiffs' billing records submitted in support. (Doc. No. 245; Doc. No. 235, Exh. D.) According to Defendants Supplemental Memorandum Regarding Attorney's Fees and Costs, Plaintiffs are not entitled to a full fees award because the billing records: (1) contain overly broad time entry descriptions that are inclusive of work not related to the Motion; (2) have vague time entries that do not sufficiently describe how the work pertains to the Motion; (3) reflect unnecessary duplication of effort; (4) reflect excessive time spent on certain tasks; (5) contain mathematical errors; and (6) reflect excessive billing for clerical work. (Doc. No. 245.) Additionally, Defendants challenge various billing entries concerning Mr. Earnest, Plaintiff's expert witness, because it is unclear whether those entries pertain specifically to the Motion or to the case at large. Finally, Defendants also contend that Plaintiffs' alleged costs are not properly described.

In light of the apparent overbreadth of Plaintiff's initial fees and costs demand, the Court does not award a specific amount of fees and costs at this time. Accordingly, Plaintiffs' entitlement to the specific amount of fees and costs shall be addressed by separate order from this Court. To this effect, the parties shall have twenty (20) days from the date of entry of this Order to stipulate to an appropriate award of fees and costs. In the event the parties are unable to agree on an amount, the Court will hold an evidentiary hearing to resolve the issue. However, the parties are advised that **no fees and costs will be awarded for any work related to the Motion that is performed as of the time of entry of the instant Order.**

## IV. CONCLUSION

In light of the foregoing, it is hereby **ORDERED** as follows:

(1) Plaintiffs' Motion for Spoliation Sanctions (Doc. No. 44) is **GRANTED;**

---

8. The Court imposes sanctions against Mr. Lane pursuant to both the Court's inherent authority and 28 U.S.C. § 1927. *See Amlong & Amlong, P.A.,* 500 F.3d at 1239.

9. The amount of fees and costs awarded will be determined by separate order.

10. The Court does not impose fees and costs against outside counsel because there is no evidence to establish that any outside counsel contributed to or failed to prevent the spoliation of evidence at issue in the Motion.

(2) The following Sanctions are imposed in this case:

 a. Against all Defendants:

 ● *SCSO Emails:* Adverse inference for the destruction of emails from April 20, 2006 to April 2007. The jury shall be instructed to infer that emails deleted from April 20, 2006, to April 2007 contained information detrimental to all Defendants in this case.

 ● *The Deputies Radios:* Rebuttable presumption in favor of Plaintiffs that the radios and their missing accessories would yield evidence adverse to Defendants' case had they been produced. Plaintiffs may submit to the jury good faith arguments as to what adverse conclusion the jury might draw. Defendants may rebut Plaintiffs' contentions with appropriate, relevant evidence.

 b. Against Defendant Eslinger in his official capacity and Defendant Remus:

 ● *Deputy Remus's Laptop:* Adverse inference for the destruction of MCT Unit No. SD14544, Remus's laptop computer. This jury will be instructed that Remus's laptop computer contained information detrimental to the SCSO's and Remus's defense of this case. The jury will further be instructed that it should not draw an adverse inference against Morris regarding the destruction of Remus's laptop.

 c. Against all Defendants and David Lane, each in his official capacity:

 ● An award to Plaintiffs of fees and costs, not to exceed the costs, expenses, and attorneys' fees reasonably incurred as a result of the sanctionable conduct.

(3) Within twenty (20) days from the date of entry of this Order, the parties shall stipulate to an appropriate award of fees and costs. Within twenty-five (25) days from the date of entry of this Order, the parties shall file notice with the Court, informing the Court of the parties' status concerning the stipulation to an appropriate award of fees and costs. In the event the parties are unable to agree on an amount, the Court will hold an evidentiary hearing to resolve the issue.